# EXHIBIT 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

GPH LOUISVILLE HILLCREEK LLC, *et al.*,                                    Plaintiffs

v.                                                          Civil Action No. 3:21-cv-63-RGJ

REDWOOD HOLDINGS, LLC, *et al.*,                                          Defendants

* * * * *

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

The Court conducted a 7-day bench trial on May 22–24, June 20–22, and July 6, 2023.
[DE 159 at 3406].  The parties were instructed to submit proposed findings of fact and conclusions
of law in accordance with the Court's July 7, 2023 Order.  [DE 159].

Plaintiffs/Counterclaim Defendants GPH Louisville Hillcreek LLC, GPH Louisville
Camelot LLC, GPH Louisville Mt. Holly LLC, GPH Louisville St. Matthews LLC, GPH Frankfort
LLC, GPH Kirtland LLC, GPH Vanceburg LLC, GPH Stanford LLC, and GPH Greensburg LLC
(collectively, "Plaintiffs") submitted their proposed findings of fact and conclusions of law.  [DE
165].  Defendants/Counterclaim Plaintiffs Redwood Holdings, LLC ("Redwood"), Hillcreek
Leasing, LLC, Camelot Leasing, LLC, Mt. Holly Leasing, LLC, St. Matthews Leasing, LLC,
Frankfort Leasing, LLC, Kirtland Leasing, LLC, Vanceburg Leasing, LLC, Stanford Leasing,
LLC, and Green Hill Leasing, LLC (all entities other than Redwood are "Facility Operators"); and
Eli M. Gunzburg ("Gunzburg") (collectively, "Defendants") responded.  [DE 167].  Defendants
also filed their proposed findings of fact and conclusions of law [DE 164] and Plaintiffs responded
[DE 166].

After a bench trial, "the court must find the facts specially and state its conclusions of law
separately."  Fed. R. Civ. P. 52 (a)(1).  The findings of fact and conclusions of law must "support

1

the ultimate legal conclusions reached." *Zack v. Comm'r*, 291 F.3d 407, 412 (6th Cir. 2002) (citation omitted). Such findings must generally "reveal the logic behind the trial court's decision," and they must "enable an appellate court to conduct a meaningful review of the trial court's order." *Id.* (citing *Grover Hill Grain Co. v. Baughman–Oster, Inc.*, 728 F.2d 784, 792–93 (6th Cir.1984)) ("The findings should be explicit so as to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the grounds on which the trial court reached its decision."). However, this Court need not "make factual findings directly addressing each issue that a litigant raises." *Id.* (citing *In re Fordu*, 201 F.3d 693, 710 (6th Cir. 1999) (The Sixth Circuit has "not interpreted [Rule] 52 to require trial courts to explicitly treat each issue raised.")); *see also Grover Hill Grain Co.*, 728 F.2d at 792 ("It is not necessary for the District Court Judge to prepare elaborate findings on every possible issue raised at trial."). Instead, the Sixth Circuit requires that "findings are to be liberally construed in support of a judgment, even if the findings are not as explicit or detailed as might be desired." *In re Fordu*, 201 F.3d at 710.

In this case, the findings necessarily "involve credibility determinations," in which case "great deference" is afforded to "the district court's factual findings." *Beaven v. U.S. Dep't of Just.*, 622 F.3d 540, 547 (6th Cir. 2010) (citation and quotation marks omitted); *see also Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985) (acknowledging "the superiority of the trial judge's position to make determinations of credibility" in a bench trial); Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.").

Having considered the parties' filings, the Court now issues its findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52.

## I.    INTRODUCTION

This case involves a dispute between Plaintiffs, as landlords, and Defendants, as tenant, sub-tenants, and guarantor.  [DE 1].  Following a three-year lease term for nine skilled nursing facilities, the parties failed to resolve their differences over lease obligations.  [*Id.*; DE 16].  Plaintiffs sued Defendants for breach of the Master Lease (Count I) and Gunzburg for breach of guaranty (Count II).  [DE 1].  Defendants asserted six counterclaims against Plaintiffs: (Count I) breach of contract related to (a) security deposits, (b) de-licensing of beds, (c) capital expenditures, and (d) purchase of beds and rentals; (Count II) unjust enrichment; (Count III) promissory estoppel; (Count IV) conversion; (Count V) fraud in the inducement related to (a) financial statements and (b) de-licensing of beds; and (Count VI) negligent misrepresentation.  [DE 16].

The Court dismissed Defendants' negligent misrepresentation claim (Count VI) and any claim for fraudulent inducement based on misrepresentation about the financial condition of the facilities except as to the costs of negligence and wrongful death cases.  [DE 64].  During the final pretrial conference, Defendants agreed to dismiss Count II and Count V.  [DE 131 at 1703].  The Court also granted Plaintiffs' motion for partial summary judgment and dismissed all of Defendants' counterclaims except for Count I as it related to the de-licensure of beds.  [DE 124 at 1672].  At trial, Plaintiffs sought damages for Count I breach of contract related to Defendants' capital expenditure obligations, maintenance and repair obligations, and agreement to reimburse Plaintiffs for premises condition reports ("PCR").  [DE 165].  They also sought to enforce a guaranty agreement under Count II.  [*Id.*].  Defendants counterclaimed for damages under Count I for Plaintiffs' failure to de-license beds.  [DE 164].

For the reasons explained below, the Court now concludes that Plaintiffs are entitled to damages on their claims for capital expenditure obligations, some of their claims for breach of maintenance and repair obligations, and reimbursement for PCRs under Plaintiffs' Count I.  As to Gunzburg's guaranty agreement under Plaintiffs' Count II, the Court finds it is enforceable.  Finally, the Court determines that Defendants are not entitled to damages on their counterclaim for Plaintiffs' failure to de-license beds under Defendants' Count I.

## II.      FINDINGS OF FACT

Plaintiffs are the owners of real property, which includes the nine skilled nursing homes at issue.  [DE 143 at 2110].  Eight of the nursing homes were in Kentucky (Frankfort Facility [PX 2 at 2324], Green Hill Facility [*id.* at 2325], Hillcreek Facility [*id.* at 2326], Lyndon Facility [*id.* at 2328], St. Matthews Facility [*id.* at 2329], Mt. Holly Facility [*id.* at 2330], Vanceburg Facility [*id.* at 2331], and Stanford Facility [PX 3 at 3136]) and one was in Ohio (Kirtland Facility [PX 2 at 2333]) (collectively, "Facilities").  Around 2015, Plaintiffs decided to transition from an operator of skilled nursing facilities to a real estate company that would eventually operate as a REIT.  [DE 143 at 2110–11].  Nicholas Finn ("Finn")—then Plaintiffs' senior vice president and now CEO— was responsible for this transition, which involved identifying new operators and leasing facilities. [*Id.* at 2109, 2111].

Plaintiffs hired Houlihan Lokey to help identify potential operators.  [*Id.* at 2112].  On March 24, 2016, Gunzburg—who is the CEO and principal of Redwood—submitted two indications of interest ("IOI") for several of the Facilities.  [PX 73 at 7684; PX 74 at 7712]. Gunzburg had been engaged in the post-acute care industry for several years and involved in the sale or purchase of approximately 10 to 15 long-term care facilities.  [DE 124 at 1644].  He also holds a postgraduate degree in banking and finance.  [*Id.*].  Based on the IOI, Plaintiffs decided to

move forward with Gunzburg.  [DE 143 at 2117].  Both parties had counsel in connection with the transaction.  [DE 143 at 2127; DE 160 at 3524].

Gunzburg initially proposed for Defendants to lease the Facilities from Plaintiffs for a lease term of 10 years with two 5-year extensions.  [DE 124 at 1644].  Rent would total $6,115,000 per year with an annual 1% increase.  [*Id.*].  After receiving the loss runs in due diligence, Gunzburg realized that the cost of insurance for the Facilities would be significantly higher than he first anticipated.  [DE 160 at 3477].  Based on this new information, he sought to renegotiate the lease terms.  [DE 143 at 2126].  Ultimately, the parties negotiated a three-year lease term with rent of $2.915 million for lease year one, $3.932 million for lease year two, and $4.9 million for lease year three.  [DE 160 at 3350–51; PX 2 at 2269, 2317; PX 3 at 3132].

The parties signed the Master Lease on November 1, 2016, [PX 1], and Amended Master Lease on December 1, 2016, [PX 2], which collectively included eight of the nine facilities.[1]  Due to an outstanding citation at the Stanford Facility, Defendants would not lease the facility until the citation was remedied.  [DE 160 at 3448–51].  The parties executed the First Amended Lease on January 20, 2017, [PX 3], (together with the Master Lease and Amended Master Lease, "Master Lease") once the citation at the Stanford Facility was resolved.  Pursuant to agreements and consents, Plaintiffs allowed Redwood to sublease each facility to a Facility Operator who was bound by all covenants, duties, and obligations under the Master Lease.  [PX 4; PX 5; PX 6; PX 7; PX 8; PX 9; PX 10; PX 11; PX 12].  Gunzburg also executed a personal guaranty for certain obligations under the Master Lease.  [PX 13; PX 14].

The Master Lease terminated on October 31, 2019, after Plaintiffs declined to exercise their right to extend.  [DE 153 at 2807].  Defendants identified Exceptional Living Centers ("ELC") as

---

[1] The Court will primarily cite the Amended Master Lease because it was the form most often used at trial.

a new potential operator.  [DE 143 at 2170, 2254].  Tom Watts ("Watts"), the president and owner of ELC, testified at trial.  [*Id.* at 2254].  As detailed below, Watts ordered reports on the condition of the Facilities as part of his due diligence efforts.  [*Id.* at 2274].  Watts informed Defendants that he could not close on the transaction with Plaintiffs unless he was provided capital to remedy deficiencies in certain Facilities. [*Id.* at 2176].  After negotiations between Plaintiffs and Watts, Plaintiffs agreed to provide ELC with $340,000 for capital expenditures every year for five consecutive years.  [PX 18 at 3827].  These capital expenditure allowances totaled $1.7 million. [*Id.*].  On November 1, 2019, ELC took over the Facilities from Defendants and entered into a lease ("ELC Lease") with Plaintiffs for the Facilities.  [PX 18].

### A.  Maintenance and Repair Obligations

When entering into the Master Lease, Defendants agreed to accept the Facilities in "as is" condition, and Plaintiffs made no representations other than those explicitly provided in the Master Lease.[2]  Defendants agreed that the Facilities were satisfactory for their Primary Intended Use— operation of skilled nursing facilities.  [PX 2 at 2274–75].

Section 7.1 of the Master Lease also set forth certain maintenance and repair obligations:

Tenant shall (a) keep and maintain each Facility in good appearance, repair and condition, and maintain proper housekeeping, (b) promptly make all repairs (interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen) necessary to keep each Facility in good and lawful order and condition and in compliance with all Legal Requirements, Insurance

---

[2] Section 5.1 provides, in relevant part:
Tenant acknowledges receipt and delivery of possession of the Premises and confirms that Tenant has examined and otherwise has knowledge of the condition of the Premises, including the condition of title thereto, prior to the execution and delivery of this Lease and has found the same to be satisfactory for its purposes hereunder, including the operation of the Facilities for the Primary Intended Use.  Regardless, however, of any examination or inspection made by Tenant and whether or not any patent or latent defect or condition was revealed or discovered thereby, Tenant is leasing the Premises "as is" in its present condition.
[PX 2 at 2274–75].

> Requirements and Authorizations and to maintain each Facility in a high quality
> operating and structural condition for use for its Primary Intended Use, and (c) keep
> and maintain all Landlord Personal Property and Tenant Personal Property in good
> condition and repair and replace such property consistent with prudent industry
> practice.

[*Id.* at 2280].   Plaintiffs explain that it was important to include the language "high quality operating and structural condition" to make it clear that Defendants' obligation went beyond passing surveys by state inspectors.  [DE 143 at 2165–66].  As evidence of their interpretation, Plaintiffs point to the lease later agreed to by Plaintiffs and ELC.  [DE 165 at 3715].  The corresponding provision in ELC's lease requires only "sound operating and structural condition for use for its Primary Intended Use[.]"  [PX 18 at 3823 ("ELC Lease")].  Yet a closer reading reveals that Section 6.3 in the ELC Lease titled "Primary Intended Use" required ELC to "operate each Facility in a manner consistent with high quality healthcare facilities[.]"  [*Id.* at 3818].  Plaintiffs simply removed the "high quality" term from one section of ELC's Lease and incorporated it through another.  [*Id.* at 3818, 3823].  Accordingly, even if the ELC Lease were not the product of a separate negotiation where Defendants were not involved, the Court still could not rely on differences in the ELC Lease regarding "high quality" to inform its interpretation of the Master Lease.

According to Plaintiffs' expert, Lowell Chapman ("Chapman"), many of the Facilities' systems were beyond their expected useful life at the commencement of the lease term.  [DE 145 at 2449–50, 2452].  Other systems were poorly installed or of poor quality before Defendants assumed operation of the Facilities.  [*Id.* at 2454–55].  Over the course of Defendants' three-year lease term, Defendants spent approximately $4.5 million in maintenance and repairs along with funds spent on capital expenditures.  [DE 156 at 3356; DX II].  Due to the "keep and maintain" language in Section 7.1 of the Master Lease, [PX 2 at 2280], Gunzburg testified that the Facilities

7

were maintained with like-quality materials and craftsmanship.  [DE 160 at 3511 ("Q. Okay. And when it says maintain high quality, what if you had a building system that wasn't high quality, did you have to make it high quality? A. No. You—you replace a Honda part with a Honda part, you replace, you know, a Kia part with a Kia part, and a Rolls-Royce with a Rolls-Royce part.")].

Kentucky Medicaid performs appraisals as part of the Commonwealth's rate setting methodology to determine Medicaid reimbursement rates.  [DE 160 at 3498–99].  When the appraisal shows that the facility has improved, the skilled nursing facility will receive an increase in the capital component of its Medicaid rate.  [*Id.* at 3505].  All the Facilities appraised by the Commonwealth during Defendants' lease term were awarded rate increases.  [*Id.* at 3503–504].  Defendants also conveyed the Facilities to ELC with no life safety or building code violations.  [DE 153 at 2860].  The Facilities had all requisite licenses and authorizations to operate a skilled nursing facility under the requirements imposed by the Centers for Medicare and Medicaid Services ("CMS").  [*Id.* at 2861, 2865–67].

Despite the extensive testimony and questioning related to the various items that Plaintiffs claim Defendants failed to repair under the Master Lease, Plaintiffs have limited their claims for deferred maintenance to the $1.7 million it conceded to ELC as part of their negotiations for the ELC Lease.  [DE 165 at 3724].  As of the time of the parties' briefing, ELC had used their capital allowance for:

    a.  Replacement of the Clifton Oaks roof ($221,682.15);
    b.  Replacement of the Kirtland roof ($213,410.00);
    c.  Reworking of the domestic water supply at Clifton Oaks to avoid issues created by leaks that formed in the copper pipes ($121,759.58);
    d.  A new boiler and chiller at Hillcreek ($122,523.45);
    e.  A parking lot at Stanford ($68,191.10);
    f.  A new roof at Vanceburg ($140,514.00);
    g.  A new cooler at Green Hill ($74,050.00); and
    h.  Investigation and remediation of settling issues at Vanceburg ($322,398.00)

[DE 165 at 3724 (citing DE 143 at 2286–87; DE 153 at 2812, 2817; PX 61; PX 199)].  These expenditures total $1,284,528.28, [DE 165 at 3724], leaving what ELC has not yet spent but expects to spend during the fourth and fifth lease year.  [DE 143 at 2288–89].

On July 29, 2019, Plaintiffs advised Defendants that they planned to order property condition reports for each of the Facilities.  [DE 153 at 2804; PX 115 at 5992].  A property condition report ("PCR") is also known as a property condition needs assessment ("PCNA").  [PX 115 at 5992].  These terms were used interchangeably throughout the trial, but the Court will use the term PCR for consistency.  Plaintiffs retained EMG to develop these reports, which EMG completed for each Facility.  [PX 20; PX 22; PX 24; PX 26; PX 28; PX 30; PX 32; PX 34; PX 36 ("EMG Reports")].  The EMG Reports were prepared in accordance with ASTM E2018-15 and included pictures, costs, and measurements for each Facility.  [DE 153 at 2920–21].  The EMG Reports appeared thorough, complete, and accurate, [DE 145 at 2433], and were completed as part of an arm's-length transaction.  [PX 20 at 12].  Plaintiffs never provided copies of the EMG Reports to Defendants during their lease term.  [DE 153 at 2904–05].

During ELC's due diligence period, it retained the services of Providence Consulting & Design ("PC&D") to perform assessments like the EMG Reports.  [PX 21; PX 23; PX 25; PX 27; PX 29; PX 31; PX 33; PX 35; PX 37 ("PC&D Reports")].  ELC had an existing relationship with PC&D.  [DE 143 at 2304–05].  Typically, PC&D would work with a potential lessee to perform the pre-purchase inspections and then immediately begin performing maintenance and improvements on the facilities once the lease was executed.  [DE 145 at 2505].  PC&D would also get the opportunity to perform capital projects for the lessee, which may have been identified in their reports.  [*Id.*].  ELC maintained this type of relationship with PC&D.  Mitch Abrams ("Abrams"), the owner and CEO of PC&D, testified that ELC quickly transitioned into their

maintenance program, and ELC hired PC&D to perform capital improvements on the Facilities. [*Id.*].

### i.  Clifton Oaks

First, the Court will review maintenance obligations at the Clifton Oaks Facility.  Plaintiffs request $221,682.15 in damages for replacing the roof at the Clifton Oaks Facility.  [DE 165 at 3724].  The PC&D Report states that the Clifton Oaks Facility's roof was over 20 years old and had "widespread active leaks throughout the building."  [PX 21 at 10].  It also explains that the roof had been repaired multiple times.  [*Id.*].  The EMG Report for the Clifton Oaks Facility, however, noted that the roof was in good/fair condition and did not estimate replacing large sections for approximately five years.  [PX 20 at 2, 4].  Plaintiffs' expert, Chapman, estimated that the expected useful life of the Clifton Oaks Facility's roof was 20 years.  [PX 39].  Abrams testified that based on his inspection of the facility and interactions with the maintenance director that the roof had active leaks.  [DE 145 at 2518–19].  Yet Chapman confirmed that no active leaks were identified when the PC&D Report was created.  [DE 145 at 2478].

Plaintiffs also request $121,759.58 for reworking the domestic water supply at the Clifton Oaks Facility.  [DE 165 at 3724].  The PC&D reports estimated $300,000 for plumbing upgrades and noted that the pipes carrying hot water often leak.  [PX 21 at 5–6].  Abrams explained that the copper pipes carrying hot water had deteriorated and developed pin holes that would leak water and seep up through the concrete.  [DE 145 at 2512–14].  Defendants had repaired at least eight leaks in the six months prior to the PC&D report, which included jackhammering the floor.  [PX 21 at 5].  That said, the EMG Report for the Clifton Oaks Facility noted that the plumbing and natural gas systems were in good condition and did not require replacement for at least another 10 years.  [PX 20 at 2, 4].

### ii.    Kirtland

Next, Plaintiffs allege they are owed $213,410 for replacing the roof at the Kirtland Facility.  [DE 165 at 3724].  The PC&D Report for the Kirtland Facility estimated $250,000 to replace the roof.  [PX 29 at 12].  The report states that "[r]epairs have been performed recently but the roof still has active leaks."  [*Id.*].  Abrams testified that he sent two contractors to look at the Kirtland roof and both found the roof beyond repair and in need of replacement.  [DE 145 at 2549].  Nevertheless, Chapman testified that despite the appearance that it had recently rained, the PC&D Reports identified no active leaks in the Kirtland Facility's roof.  [DE 145 at 2476–78].  The EMG Reports noted no active leaks in the Kirtland Facility's roof.  [PX 28 at 584].  It also identified no short-term deficiencies, "such as deteriorated membranes, ponding water, or damaged roof systems."  [*Id.*].

### iii.    Hillcreek

Plaintiffs seek $122,523.45 for replacing a boiler and chiller at the Hillcreek Facility.  [DE 165 at 3724].  The PC&D Report for the Hillcreek Facility estimated a $400,000 total spend on the facility's HVAC system.  [PX 27 at 2–3].  The chiller at the Hillcreek Facility was installed in 1969 and "need[ed] to be replaced immediately."  [*Id.*].  All 98 fan coils needed replacement.  [*Id.*].  The Hillcreek Facility had one heat boiler that had not been functional since 2016.  [*Id.*].  Abrams explained at trial that this was the redundant boiler.  [DE 146 at 2693–94].  Chapman explained that the HVAC systems were original to the building and had exceeded their expected useful life before Defendants occupied the building.  [PX 39].  Despite noting that the HVAC system was in good/fair condition, the EMG Report for the Hillcreek Facility stated that the HVAC system would soon require replacement.  [PX 26 at 369–70].  Abrams also testified that because the facility was never cited for being above 81 degrees, that Defendants must have used another means of cooling

the Hillcreek Facility.  [DE 146 at 2718–20].  He explained that Defendants would have needed to put in temporary cooling units.  [*Id.*].

### iv.   Stanford

Plaintiffs seek an additional $68,191 in damages for replacing the parking lot at the Stanford Facility.  [DE 165 at 3724].  The PC&D Report for the Stanford Facility estimated $50,000 to overlay approximately 60 spaces with asphalt.  [PX 35 at 9].  This parking lot was unique because the road ran through the middle of the Stanford Facility's parking lot.  [DE 146 at 2628].  Abrams explained that problems with the parking lot were not uncommon or unusual.  [*Id.* at 2629].  The EMG Report for the Stanford Facility noted the condition of the parking lot as good/fair and did not recommend replacements for another six years.  [PX 34 at 918, 920].

### v.   Vanceburg

Next, Plaintiffs allege they are owed $140,514 for replacing the roof at the Vanceburg Facility.  [DE 165 at 3724].  The PC&D Report for the Vanceburg Facility suggested that the roof and gutters were functional and in good condition.  [PX 37 at 10].  The report did not reveal that any expenses needed to remedy to roof.  [*Id.*].  The EMG Report also stated that the roof was in good condition.  [PX 36 at 1033].

Along with the roof, Plaintiffs seek $322,398 in damages for investigating and remediating settling issues at the Vanceburg Facility.  [DE 165 at 3724].  The PC&D Report for the Vanceburg Facility suggests a total spend of $25,000 to remedy this issue.  [PX 37 at 13].  The report acknowledges that this estimate is assuming that all previous repair efforts were successful.  [*Id.*].  "If further structural work is needed it could be a $50,000 to $100,000 issue."  [*Id.*].  The report noted that the property had "major settling issues" since its construction in the 1970s.  [*Id.*].  The EMG Report for the Vanceburg Facility noted that the foundation and superstructure were in good

condition.  [PX 36 at 1068].  Abrams testified that this settling issue was a "longstanding problem

getting worse by the day."  [DE 145 at 2551].  It was a problem that occurred over "a long period

of time."  [*Id.* at 2550].

### vi.   Green Hill

Finally, Plaintiffs seek $74,050 in damages for replacing the cooler at the Green Hill

Facility.  [DE 165 at 3724].  The PC&D Report for the Green Hill Facility recommended a total

spend of $3,000 for kitchen replacements.  [PX 25 at 8].  The report noted only minor issues in the

kitchen area and stated that the walk-in cooler was original to the building.  [*Id.*].  The cooler doors

were not adequately sealing, and the cooler had ice build-up.  [*Id.*].  The report recommended

replacing the cooler doors.  [*Id.*].  The EMG Report for the Green Hill Facility does not discuss

the condition of the cooler.  [PX 24].  Abrams testified that he was unsure whether the doors to the

cooler were warped or whether the seal simply needed to be replaced.  [DE 146 at 2654–55].

### B.  Obligations to Pay for Property Condition Reports

Section 7.2 of the Master Lease discusses Defendants' obligation to reimburse Plaintiffs

for PCRs:

> Landlord may from time to time cause a qualified consultant designated by
> Landlord, in its sole discretion, to inspect any Facility and issue a report (a
> "Premises Condition Report") with respect to such Facility's condition. Without
> limitation of any other obligation of Tenant under this Lease, Tenant shall, at its
> own expense, immediately make any and all repairs or replacements that are
> recommended by such Premises Condition Report that relate to life safety. Tenant
> shall pay the cost of any Premises Condition Report ordered by Landlord . . . .

[PX 2 at 2280].  Section 2.2 of the Master Lease, required Defendants to "pay and discharge as

and when due and payable all other amounts, liabilities and obligations which Tenant assumes or

agrees to pay under this Lease."  [*Id.* at 2270].  Defendants had to make payment on these

obligations within 10 days or be subject to a 5% late fee and interest at 5% per annum above the prime rate on such amounts.  [*Id.* at 2271, 2282].

In response to an email from Gunzburg on July 29, 2019, Finn suggested that the parties should order PCRs as part of their end of lease discussion.  [PX 115 at 5992].  An agenda sent from Heather Andrews ("Andrews") to Gunzburg on August 21, 2019, notes that PCRs will be ordered for each facility at Defendants' expense and "shall not exceed $5k for any Facility."  [DX D33 at 2073].

Plaintiffs engaged EMG to conduct the PCRs.  [DE 143 at 2173; DE 153 at 2776].  On September 9, 2019, Andrews emailed Dawn Cochran ("Cochran"), Defendants' regional director of operations, to schedule EMG's assessment of the facilities.  [DX D67 at 8405].  Cochran coordinated filling out pre-tour survey forms and accompanied EMG's representatives on the tours.  [DE 156 at 3136, 3161, 3192–93, 3241].  Andrews testified that EMG charged Plaintiffs $2,500 per facility to conduct their assessment and develop reports.  [DE 153 at 2779].  On November 6, 2019, Andrews emailed Gunzburg notifying him that Defendants owed $22,500 for the EMG Reports.  [PX 133 at 6235].  Andrews testified that she never sent Defendants a copy of the EMG Reports or invoices for the PCRs.  [DE 153 at 2908].  Plaintiffs also produced no invoices for the PCRs at trial.  Although Andrews stated that operators had paid expenses without having a copy of the invoice, Andrews conceded that nursing home operators would typically want a copy of the invoice before making payment.  [*Id.* at 2908–09].

Defendants contend that they should have been provided with an invoice before paying for the PCRs.  [DE 160 at 3619].  Gunzburg also stated that Defendants never paid for the PCRs.  [*Id.*]. George Amar ("Amar"), Defendants' chief financial officer, testified that as a matter of course and practice, Defendants would not pay for expenses without receiving an invoice.  [DE 156 at 3373].

Amar was a CPA and certified in generally accepted accounting principles ("GAAP"). [*Id.* at 3315–16]. Amar testified that paying an expense without an invoice would not be an acceptable practice under GAAP. [DE 156 at 3374].

### C. Capital Expenditures

Section 7.6 of the Master Lease required Defendants spend an amount

> equal to the product of (a) the Required Per Bed Annual Capital Expenditures Amount (as adjusted at the end of each Lease Year to reflect the CPI Increase during the immediately preceding Lease Year), times (b) the weighted average of the number of licensed beds in such Facility during such Lease Year, on Capital Expenditures.

[PX 2 at 2282 ("Capital Expenditure Requirement")]. The amount of capital expenditures made during a lease year was defined as the "Actual Capital Expenditure Amount." [*Id.*]. Within 30 days following the end of each lease year, Defendants were required to provide Plaintiffs with a Capital Expenditures Report summarizing and describing all Capital Expenditures made during the preceding lease year. [*Id.*]. The Capital Expenditures Requirement per bed, per facility was $450.00, for lease year one, $457.97 for lease year two, and $468.59 for lease year three. [PX 137 at 7191; PX 159].

A "Capital Expenditure" was defined as "repairs, replacements and improvements to such Facility . . . that (i) constitute capital expenditures in accordance with GAAP and (ii) have been completed in a good, workmanlike and lien free fashion[.]" [PX 2 at 2313]. A Capital Expenditure did not include "(a) expenses related to routine repairs and maintenance, (b) purchases of office equipment, or (c) any other expenditures not reasonably characterized as a 'capital expenditure.'" [*Id.*]. When the Defendants had a Capital Expenditure deficit, they were required to make deposits, which were referred to as "Capital Expenditure Deposits." [PX 2 at 2282]. Yet Defendants concede that they never made the required Capital Expenditure Deposits. [DE 153 at 2791–92].

Under Sections 2.2 and 2.4 of the Master Lease, Plaintiffs were entitled to a late fee of 5% and interest at 5% per annum above the prime rate from the due date of the Capital Expenditure Deposit.  [PX 2 at 2271].

Defendants never delivered a timely, complete, or certified Capital Expenditures Report to Plaintiffs for lease year one or two.  [DE 153 at 2790, 2798–99; DE 155 at 2991].  At the end of the lease term, Defendants had a Capital Expenditure deficit of $195,217.28 across four Facilities: Green Hill, Hillcreek, Lyndon Woods, and Kirtland.  [DE 153 at 2796; DE 156 at 3328].  Without accounting for labor, the parties agree to the following principal amount of Capital Expenditure deficit for each facility:  Green Hill ($52,700.52), Hillcreek ($30,631.88), Lyndon Woods ($49,257.71), Kirtland ($62,627.16).  [DE 164-1; DE 165-4].  The Master Lease does not specify who determines whether an expenditure is considered a Capital Expenditure.  [DE 153 at 2874].  Here, Plaintiffs made those determinations, but there was no appeals process.  [*Id.* at 2877].

At trial, Amar testified that Defendants submitted expenses to Plaintiffs for approval as a Capital Expenditure, but some of these expenses were denied.  [DE 155 at 3020].  Amar testified that one of the expenditures Plaintiffs denied was labor that accompanied installation of an IT network.  [*Id.*].  At the outset of the Master Lease, Defendants purchased Plaintiffs' old IT system and hardware for approximately $140,000.  [DE 160 at 3490–91, 3493].  In December 2016, after realizing that the IT system did not function properly, Defendants sought proposals from All Covered to reimage or redeploy the system.  [DE 160 at 3494; DX D5 at 5344].  Defendants chose the Cloud with ACC-KY Support package, which included a labor cost of $2,236.67 per Facility.  [DE 156 at 3331, 3333].  Plaintiffs did not count the labor towards Defendants' Capital Expenditures because they asserted this counted as office equipment.  [DE 156 at 332].

The redeployment efforts failed, so Defendants replaced the IT network with a system known as Citrix in 2017.  [DE 153 2886–88; DE 156 at 3334, 3338].  The labor associated with the installation of the Citrix system was $19,697.52 per facility.  [DX D74 at 8998, 8999, 9005, 9008].  Plaintiffs did not allow the labor costs associated with the Citrix system to count toward Defendants' Capital Expenditure Requirement.  [DE 156 at 3337].  At the end of 2017 and the beginning of 2018, Defendants had to scrap the Citrix system and install a new IT system.  [DE 156 at 3338].  This time, Plaintiffs allowed some of the hardware and a portion of the labor— $5,000 for both the Green Hill Facility and the Hillcreek Facility—to count toward Defendants' Capital Expenditure Requirement.  [DE 156 at 3326, 3344; DX D92].  Even so, Plaintiffs disallowed $20,000 in labor at the Kirtland Facility, $20,000 in labor at the Lyndon Woods Facility, $15,000 in labor at the Green Hill Facility, and $15,000 in labor at the Hillcreek Facility. [DE 153 at 2890; DE 160 at 3496–97].

Amar, who is certified in GAAP [DE 156 at 3315–16], testified that labor associated with software is generally characterized as a capital expenditure under GAAP.  [*Id.* at 3321].  He also testified that labor associated with leased equipment is often treated as a capital expenditure under a multi-year lease.  [*Id.* at 3321].  Andrews, who testified about Plaintiffs' characterization of expenses as Capital Expenditures, was not trained or certified in GAAP.  [DE 153 at 2873]. Andrews testified that she did not know whether GAAP permits labor expenses to be counted as Capital Expenditures.  [DE 153 at 2874–75].

### D.  Kirtland Facility Bed De-licensure

When negotiating for the Master Lease, Defendants identified the Kirtland Facility as one where census—the number of beds filled by residents—was in steady decline.  [DE 153 at 2936]. Gunzburg testified that the Kirtland Facility was "one of the oldest vintage buildings in that

market." [DE 160 at 3453].  The facility had 180 licensed beds, but census had dropped to 113

prior to Defendants assuming operation of the building.  [PX 69].  Gunzburg testified that Plaintiffs

would have to de-license beds to turn the facility around.  [DE 160 at 3437].  Although Defendants

wanted to de-license beds at the Kirtland Facility prior to executing the Master Lease, Gunzburg

testified that he agreed to try to fill the beds for the first year.  [*Id.* at 3436–37, 3468].  Although

Defendants allege that Plaintiffs promised to de-license beds if Defendants did not succeed after

the first year, Defendants produced no evidence other than Gunzburg's testimony.  [*Id.* at 3436–

37].  The parties' negotiations resulted in Section 18.4 of the Master Lease, which includes:

> For the avoidance of doubt, Tenant hereby acknowledges and agrees that all of the
> bed rights (whether related to a bed that is in service or not at any given time)
> associated with the operating licenses and other Authorizations for each Facility are
> owned by, and are the property of, Landlord . . . .  Notwithstanding the foregoing,
> from time to time after the first Lease Year, Tenant may submit a written notice to
> Landlord requesting that Landlord approve the transfer, surrender or de-licensure
> of a portion of the Excess Beds no longer necessary for the continuing operation of
> the Facility located in Kirtland, Ohio (the "Ohio Property") in the Ordinary Course
> of Business. Such written request shall include a detailed description of Tenant's
> proposed plans and timeline for the transfer, surrender or de-licensure of such
> Excess Beds and shall also include detailed financial projections showing the
> financial benefit such action. Provided that the proposed transfer, surrender or de-
> licensure of such Excess Beds will not, as determined by Landlord in its
> commercially reasonable judgment, negatively impact the value of the Ohio
> Property in any material respect, Landlord's consent to such action shall not be
> unreasonably withheld, conditioned or delayed.

[PX 2 at 2303].  Gunzburg testified that he would have walked away from the deal with Plaintiffs

but for their promise to de-license beds at the Kirtland Facility.  [DE 1660 at 3476].

On November 16, 2017, Defendants requested that Plaintiffs de-license 60 beds at the

Kirtland Facility.  [DE 143 at 2145–46; PX 92].  The request consisted of a single page letter

stating that de-licensing the beds would save Defendants $280,000 per year in bed taxes.  [PX 92].

The de-licensing would need to occur before December 31, 2017, to save on the bed taxes for the

first six months of 2018.  [*Id.*].  The letter did not contain any profit and loss statements or

supporting documentation. [*Id.*]. Plaintiffs were concerned the de-licensing 1/3 of the beds at the Kirtland Facility would drastically affect the value of the property. [DE 143 at 2146–48; 2156, 2218–19]. Finn explained that nursing homes often "trade on a per bed basis, so . . . the more beds, generally, the higher [the] purchase price." [DE 143 at 2159, 2228]. Watts also testified that many in the industry price facilities on a price per bed basis. [*Id.* at 2296]. Even beds that are not filled have value because a different operator may be able to fill them. [*Id.* at 2159]. Once beds were de-licensed through the state, they were "gone forever." [*Id.* at 2190].

Finn testified that he did not believe the letter he received requesting to de-license 60 beds at the Kirtland Facility met the requirements of Section 18.4. [*Id.* at 2146–47]. Defendants also had significant concerns about Defendants and their ability to sustain the operations at the Facilities. [DE 143 at 2138, 2157]. Even though Defendants were receiving cash that belonged to the former operator (Plaintiffs) Defendants would raise "a litany of excuses and delays" when asked to remit those funds to Plaintiffs. [DE 143 at 2135–37]. Plaintiffs consistently had to follow up to get Defendants to pay rent and real estate taxes. [DE 143 at 2137; DE 145 at 2343].

In December 2017, Plaintiffs received a copy of a default notice from Midcap, Defendants' working capital lender. [DE 143 at 2138–40, 2147, 2197]. MidCap had a first priority security interest in Defendants' accounts receivable, and MidCap automatically swept their incoming cash into a bank account controlled by MidCap. [*Id.* at 2131–32, 2139; PX 15; PX 16; PX 17]. If Defendants were in default with MidCap, MidCap could limit Defendants' ability to borrow, which was needed to provide care to residents and paying employees, vendors, taxes, and rent. [DE 143 at 2132–33; DE 160 at 3589]. For this reason, a default under the MidCap loan constituted a default under the Master Lease. [DE 143 at 2133; PX 2 at 2294 (Section 13.1.4)].

As a result, Plaintiffs did not consent to the November 16, 2017, request to de-license beds at the Kirtland Facility. [DE 143 at 2157–60; 2207, 2218–19]. In an email on November 30, 2017, Defendants told Plaintiffs that there were open issues between the parties that needed to be addressed. [DX D13]. Gunzburg attempted to call Finn about the beds but was unsuccessful. [DE 160 at 3462]. On December 26, 2017, Gunzburg emailed Finn to ask him to approve the de-licensure of 60 beds at the Kirtland Facility. [PX 94]. Finn responded that Plaintiffs could not accommodate the request at that time because the beds were too valuable. [*Id.*].

On January 17, 2018, Finn asked Gunzburg how many beds, ideally, would Defendants like to remove from Kirtland. [DE 160 at 3472–73; DX D79 at 1957]. Gunzburg called Finn and stated that he would like to de-license 60 beds. [DE 160 at 3472–73]. In October 2018, he orally requested to de-license 81 beds at the Kirtland Facility. [DE 155 at 3046]. However, this request was tied to negotiations to extend the lease term, which never materialized. [*Id.*].

Despite Plaintiffs' assertion that nursing homes were priced per bed, Defendants introduced evidence suggesting that the Kirtland Facility may have been more valuable with less beds. [DE 160 at 3420]. Gunzburg testified that the most common methodology for determining the value of a nursing home is cap rate. [DE 160 at 3418]. Skilled nursing facilities are assigned a risk percentage, with a range of 8% to 14% [DE 145 at 2364]. The lower the risk, the lower the percentage. [DE 160 at 3416–18]. Gunzburg testified that using a cap rate of 13%, reducing the bed licenses by 60, would have increased the value of the facility by $2.15 million. [DE 160 at 3421]. Defendants provided no other independent evidence or expert testimony on this issue.

### III.     CONCLUSIONS OF LAW

#### A.  Maintenance and Repair Obligations

At the outset, the Court reiterates that Plaintiffs have limited their damages for breach of the maintenance and repair obligations to the $1.7 million allowance to ELC, of which a total of $1,284,528.28 was spent.     [DE 165 at 3724, 3728 ("Golden Living's damages are the $1,700,000.00 it had to provide to ELC in the ELC Lease in order to secure ELC as a subsequent tenant for the Facilities[.]")].  While there was discussion at trial about $6.6 million worth of work recommended by the PC&D Reports, [DE 143 at 2283], as well as repairs that were not accounted for in the $1,284,528.28 spent, [*see, e.g.*, DE 145 at 2538–39 (discussing mold issues at Lyndon Woods Facility)], Plaintiffs only sought $1.7 million in damages, as they explained in their opening at trial.  [*Id.* at 2081 ("plaintiffs have suffered damages of 1.7 million dollars in the form of an agreement to provide that amount to the subsequent operator of the facilities for it to use to repair the facilities and bring them into better condition")].  But this is not an appropriate measure of damages, as this amount was a product of a separate negotiation between Plaintiffs and ELC, where Defendants were not a party.

"[U]nder Delaware law, the standard remedy for breach of contract is based on the reasonable expectations of the parties that existed before or at the time of the breach."[3]  *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1132–33 (Del. 2015), *as corrected* (Dec. 28, 2015); *see also Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001) ("[T]he standard remedy for breach of contract is based upon the reasonable expectations of the parties *ex ante*.").  If a plaintiff does demonstrate a contract breach, "damages are designed to place the injured party in an action for

---

[3] The Master Lease requires the application of Delaware law.  [PX 2 at 2308 ("This Lease shall be governed by and construed and enforced in accordance with the internal laws of Delaware . . . This Lease is a commercial rental agreement under Delaware law.")].

breach of contract in the same place as he would have been if the contract had been performed. Such damages should not act as a windfall." *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009) (citation and quotation marks omitted). That means that "the non-breaching party is entitled to recover damages that arise naturally from the breach or that were reasonably foreseeable at the time the contract was made." *Id.* (citations and quotation marks omitted).

Plaintiffs claim up to $6.6 million of work was required to improve the Facilities as a result of Defendants' breach of maintenance and repair obligations based on only PC&D's assessment.[4] They then assert that this required them to negotiate a $1.7 million capital expenditure allowance with ELC, and so they are entitled to this entire sum.[5] But a concession to a third party, ELC, in a subsequent lease negotiation, was not a "reasonably foreseeable" damage flowing from a breach of the Master Lease. Instead, Defendants are only liable to Plaintiffs for costs that directly resulted from Defendants' failure to conduct maintenance or repairs that the contract required them to make, thus placing them "in the same place as [Plaintiffs] would have been if the contract had been performed." *Paul*, 974 A.2d at 146. The parties' reasonable expectations *ex ante* did not include a lump sum given to ELC in a subsequent negotiation; rather, they encompassed the cost of

---

[4] It is notable that a significant portion of the $6.6 million estimated in the PC&D Report was for cosmetic repairs that were not required by maintenance and repair obligations. [DE 143 at 2171, 2176 ("I think 3 million dollars of cosmetics"), 2283–84]. Additionally, PC&D had an existing business relationship with ELC, making these reports less reliable. And furthermore, the PC&D Report estimates often far exceed the amount actually spent to remedy the issue. For instance, as Defendants point out, the Clifton Oaks water line repair cost $121,759.58 instead of $300,000, and the Hillcreek chiller cost $122,523.45 instead of $400,000. [DE 167 at 3793; DE 165-3 at 3738, 3743]. For those reasons, the Court does not find that the PC&D Report estimates can serve as a reliable measure of damages.

[5] Plaintiffs explained this position in their trial brief:

> [Plaintiffs'] expert, Lowell Chapman, has reviewed the PC&D reports and additional reports the [Plaintiffs] had prepared concerning the condition of the facilities at the expiration of the Master Lease. He concluded based on his review that there were more than $6.6 million in costs related to poor maintenance and upkeep of the facilities and their fixtures. Due to the condition of the facilities, ELC negotiated as part of its lease of the facilities an allowance of $1.7 million to be reimbursed by [Plaintiffs] for work ELC would have performed to repair the facilities to good condition.

[DE 120 at 1605–06].

performing the maintenance and repairs that Defendants were obligated to perform if they failed to do so.  As a result, the Court cannot use the $1.7 million concession to ELC as a measure of damages because this figure could reflect any number of factors from that negotiation.[6]  Thus, Plaintiffs' claim for any amount beyond the actual cost of maintenance and repairs that Defendants were bound to perform under the Master Lease fails as a matter of law.[7]  As a result, this Court will assess each item of damages sought on a case-by-case basis to determine whether (1) Defendant breached their duty to keep and maintain that specific Facility during the term of the Master Lease and, (2) if so, the resulting amount of damages that would put Plaintiffs in the same place as they would have been if the contract had been performed.

### i.    Scope of maintenance and repair obligations

At issue is the nature of Defendants' maintenance and repair obligations under Section 7.1 of the Master Lease.  Both parties agree that Section 7.1 must be interpreted in accordance with its plain language but disagree on what its plain language requires.  [DE 164 at 3660–61; DE 166 at 3765].

To prevail on a claim of breach of the Master Lease, Plaintiffs must prove a contractual obligation, breach, and damages.  *Connelly v. State Farm Mut. Auto. Ins. Co.*, 135 A.3d 1271, 1279 n.28 (Del. 2016).  Under Delaware contract principles, the Court must "construe the [Master Lease] as a whole, giving effect to all provisions therein[,]" *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985), and "give priority to the parties' intentions as

---

[6] Defendants assert that seeking $1.7 million in damages for the ELC allowance invokes the indemnification clause of the Master Lease.  [DE 167 at 3792–93 (citing PX 2 at 2299)].  While the Court agrees that this is an inappropriate measure of damages, it is not for this reason.  It is because this sum is the product of a separate contract negotiation, not a "claim, action or proceeding" against Plaintiffs, as the indemnification clause of the Master Lease contemplates.  [PX 2 at 2299].

[7] Here, that means the $415,471.72 difference between the $1.7 million concession to ELC and the $1,284,528.28 that was actually spent must be disallowed.  [DE 165 at 372; DE 143 at 2288–89].

reflected in the four corners of the agreement." *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012). "The Court will interpret clear and unambiguous terms according to their ordinary meaning." *Id.* at 780. Yet "[w]hen a contract's plain meaning . . . is susceptible to more than one reasonable interpretation, courts may consider extrinsic evidence to resolve the ambiguity." *Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014). Additionally, "the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *E.I. du Pont de Nemours & Co.*, 498 A.2d at 1113 (citing *Stemerman v. Ackerman*, 40 Del. Ch. 431, 184 A.2d 28, 34 (1962)).

Applying these principles, Section 7.1 delineated Defendants' maintenance and repair obligations into three distinct categories, as described in 7.1(a), 7.1(b), and 7.1(c). Although each of these three subsections denotes a different type of maintenance and repair obligation, the parties conflate their language at various points of this litigation, often reading a phrase from one part of Section 7.1 into another or overemphasizing an individual aspect of Section 7.1. [*See* DE 165 at 3715 (reading 7.1(a) and 7.1(b) together to establish a broad requirement that went beyond passing inspections); DE 164 at 3660 (citing cases relating to "good repair and condition" to emphasize this softer language of 7.1(b))]. But to give effect to all provisions within the Master Lease, each subsection must be construed to impose its own type of obligation, otherwise the deliberate separation of Section 7.1 into discrete requirements would be "mere surplusage." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage.") (quoting *Kuhn Construction, Inc. v. Diamond State Port Corp.*, 2010 WL 779992,

at *2 (Del. Mar. 8, 2010)).  Accordingly, the Court will look to each part of Section 7.1 of the Master Lease in turn.

Section 7.1(a) establishes a general maintenance obligation to maintain the "good appearance" of the Facilities.  [PX 2 at 2280].  The phrases "good appearance, repair[,] and condition" and "proper housekeeping" suggest that Section 7.1(a) speaks to the primarily visual component of the normal, daily upkeep of any commercial facility.  [*Id.*].  Tasks like cleaning floors and equipment and performing minor repairs such as replacing ceiling tiles or lightbulbs could contribute to the "good appearance" and "proper housekeeping" described in Section 7.1(a).  Section 7.1(c) required Defendants to repair and replace any Landlord Personal Property that was damaged.  [*Id.*].  "Landlord Personal Property" is defined by Exhibit C of the Master Lease as "all machinery, equipment, furniture, and other personal property[.]"  [*Id.* at 2336].  None of the items subject to Plaintiffs' claims for which they seek damages—roofs, settling issues, water supply, a parking lot, a cooler, chiller, and boiler—fall properly under Section 7.1(a) or 7.1(c).  Instead, Plaintiffs' claims fall under Section 7.1(b).

Section 7.1(b) contains two parts.  The first requires Defendants to perform "repairs" to "keep each Facility in good and lawful order and condition" to comply with "Legal Requirements,[8]

---

[8] According to the Master Lease, "Legal Requirements" meant:

> all federal, state, county, municipal and other governmental statutes, laws (including common law and Hazardous Materials Laws), rules, policies, guidance, codes, orders, regulations, ordinances, permits, licenses, covenants, conditions, restrictions, judgments, decrees and injunctions applicable to Tenant or Guarantor or affecting any Facility or the applicable Tenant Personal Property or the maintenance, construction, use, condition, operation or alteration thereof, whether now or hereafter enacted and in force, including, any and all of the foregoing that relate to the use of each Facility for its Primary Intended Use.

[PX 2 at 2319].

Insurance Requirements[9] and Authorizations[.]¹⁰" [*Id.* at 2280].  The second requires Defendants to "maintain" the Facilities "in a high quality operating and structural condition for its Primary Intended Use." [*Id.*].  "Primary Intended Use" is defined by the Master Lease "as to each Facility, the type of healthcare facility corresponding to such Facility as shown on Schedule 2 attached hereto, with no less than the number of licensed beds as shown on Schedule 2 and for ancillary services relating thereto." [PX 2 at 559 (emphasis omitted)].  Each healthcare facility, as reflected by Schedule 2, is a "skilled nursing facility." [*Id.*].  The descriptor of "high quality" is explicitly tied to "maintaining" for "Primary Intended Use."  Defendants were required to maintain each Facility with everything operationally and structurally necessary to be a skilled nursing facility with the number of licensed beds shown on the schedules and ancillary services.

Taken together, the provisions of Section 7.1(b) required Defendants to maintain the Facilities in a condition that met the requirements for a skilled nursing facility, whatever efforts that may entail.[11]  Section 7.1(b) is explicit that this obligation is broad in scope, encompassing "all repairs . . . necessary" including "interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen[.]"  [*Id.*].  The "high quality" language is directly connected to Defendants requirement to maintain the Facilities for their intended use without

---

[9] "Insurance Requirements" is defined by the Master Lease as "all terms of any insurance policy required by this Lease and all requirements of the issuer of any such policy, together with all fire underwriters' regulations promulgated from time to time." [PX 2 at 2318].

[10] According to the Master Lease, "Authorization" meant:

> with respect to each Facility, any and all licenses, permits, certifications, accreditations, Provider Agreements, CONs, certificates of exemption, approvals, waivers, variances and other governmental or "quasi-governmental" authorizations necessary or advisable for the use of such Facility for its Primary Intended Use and receipt of reimbursement or other payments under any Third Party Payor Program in which such Facility participates.

[PX 2 at 2313].

[11] It is notable that the Facilities had no outstanding life safety or building code citations at any of the properties when Defendants turned them over to Plaintiffs. [DE 153 at 2860].  And each of the Facilities appraised by the Commonwealth while Defendants were operating them received rate increases, reflecting improvement in the facilities. [DE 160 at 3503–05].

citations and violations and without lacking any of the beds or other ancillary services required to run a skilling nursing facility.[12]   It does not create some new, higher standard to be read into all the other maintenance obligations in Section 7.1 or to improve every aspect of the interior and exterior of the Facilities.[13]

Plaintiffs disagree, placing significant emphasis on the single occurrence of the phrase "high quality" in Section 7.1(b).  [DE 166 at 3768].  In Plaintiffs' view, the "high quality" language proves that Defendants' obligations went beyond simply meeting survey requirements, emphasizing the difference between "high quality" and "a standard of functionality."[14]  [DE 165 at 3715, 3727; DE 166 at 3768].  Plaintiffs argue that it would "not have been difficult" for the parties to incorporate a lesser obligation than "high quality," pointing to the difference in language between the Master Lease and the corresponding provision in the subsequent ELC Lease.  [DE 166 at 3768].  But this argument is without support because the provisions are not, in fact, different. Plaintiffs merely incorporated the same "high quality" language into the ELC Lease via a different

---

[12] Because the term is explicitly tied to "Primary Intended Use" as skilled nursing facilities, "high quality" in this context means that even a few violations of the Commonwealth's skilled nursing facility requirements would have been unacceptable.  The Facilities were expected to receive high marks as a skilled nursing facility on all inspections and avoid any citations.  A facility that was constantly curing citations for poor operating and structural conditions would not be considered "high quality" under the terms of Section 7.1(b).  Therefore, even though Defendants could have maintained its licenses to operate skilled nursing facilities with outstanding citations, it would not be in "high quality" operating and structural condition for the purposes of the Master Lease.

[13] The Court finds Section 7.1 clear enough to interpret "according to [its] ordinary meaning." *Athenian Venture Partners I*, 36 A.3d at 779.  But even if there were ambiguity, extrinsic evidence would resolve it in favor of the Court's interpretation. *See Salamone*, 106 A.3d at 374.  For instance, Plaintiffs assert that Defendants were aware of the scope of their obligation, pointing to a communication from Gunzburg where he requested prior PCNA reports to avoid any "multi-million dollar surprises," [PX 76], as well as two provisions in the Master Lease shifting the obligation to repair specific defects back to Plaintiffs.  [DE 166 at 3767].  This evidence provides further context to the nature of the parties' understanding and confirms the scope of Defendants obligations under Section 7.1.

[14] "Standard of functionality" is a term Plaintiffs use in their briefing to characterize and contrast Defendants' position with its own interpretation of "high quality" in the contract.  [DE 165 at 3768 ("[I]t would not have been difficult for the parties to incorporate a standard of functionality as opposed to the standards to which the parties did agree.")].  It is not a defined term used in the contract itself.

section.  [PX 18 at 3818].  Thus, this argument fails, and the Court cannot glean any meaning by analogy to the ELC Lease on this point.

Plaintiffs' interpretation of "high quality" reads Section 7.1 more like a capital expenditure requirement, which the Master Lease already provides for in a separate section.  [*See* PX 2 at 2282–83].  A single use of a vague phrase like "high quality" cannot, by itself, impose an obligation to improve all aspects of the Facilities to meet such an abstract standard.[15]  *See E.I. du Pont de Nemours & Co.*, 498 A.2d at 1113 (explaining a contract should be "construe[d] . . . as a whole, giving effect to all provisions therein").  In essence, Plaintiffs assert that the language required all aspects of the Facilities be brought up to a "high quality" operating condition regardless of the age or condition when the Defendants took occupancy because it was taken in "as is" condition.  This would amount to an obligation to *improve* the property, not to repair and maintain it.  Indeed, the testimony at trial made clear based on the age and useful life of many of the operating and structural issues cited by Plaintiffs that the Facilities were not in "high quality" condition—as Plaintiffs would have this Court interpret that obligation—on the day the Defendants entered the Master Lease.  In sum, if the Court adopted Plaintiffs' interpretation of "high quality," Defendants would have been in breach from day one.

---

[15] In other contexts, courts have seen "high quality" as too abstract and vague to rely on.  *See*, *e.g.*, *Ohio Head Start Ass'n, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 902 F. Supp. 2d 61, 66 (D.D.C. 2012) ("'High quality and comprehensive' is not a specific substantive predicate.  'High quality' is significantly more vague that 'the need for control.'  Congress recognized as such when it required the Defendants to convene an expert panel to provide guidance as to what the term means."); *Lin v. Canada Goose US, Inc.*, 640 F. Supp. 3d 349, 359 (S.D.N.Y. 2022) ("A reasonable consumer would recognize the words 'high quality' as a 'general claim of superiority over comparable products that is so vague that it can be understood as nothing more than a mere expression of opinion.'") (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 160 (2d Cir. 2007)); *Begay v. Medicus Healthcare Sols., LLC*, No. CV 15-500 JCH/SCY, 2015 WL 13650107, at *6 (D.N.M. Nov. 18, 2015) (explaining "high quality medical staff" is "quite vague and broad").

Plaintiffs also assert that the "as is" provision of the Master Lease required Defendants to carry out their maintenance and repair obligations regardless of the condition prior to taking possession of the Facilities. [DE 166 at 3767]. Delaware courts have construed similar provisions this way in previous cases. *See Navient Solutions, LLC v. BPG Off. Partners XIII Iron Hill LLC*, 2023 WL 3120644, at \*13 (Del. Sup. Ct. Apr. 27, 2023) (explaining that because tenant accepted property in "as is" condition, maintenance requirement applied "regardless of whether the need arose before the Lease started"). Plaintiffs support that position by pointing out that the parties agreed to an "absolutely net lease," [DE 166 at 3766], which "presumes the landlord will receive a fixed rent, without deduction for repairs, taxes, insurance or any other charges, other than landlord's income taxes." *Washington Univ. v. Royal Crown Bottling Co. of St. Louis*, 801 S.W.2d 458, 466 (Mo. Ct. App. 1991) (quoting 1 M. Friedman, FRIEDMAN ON LEASES § 10.8 at 672–73 (3d ed. 1990)); *see also W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, No. CIV.A. 2742-VCN, 2009 WL 458779, at \*2 n. 7 (Del. Ch. Feb. 23, 2009) ("In a triple net ground lease, the tenant pays the maintenance costs, property taxes, insurance, and utilities associated with a parcel, in addition to rent."). This argument has merit and is consistent with the Court's reading of Section 7.1(b). Therefore, the mere fact that required maintenance or repairs could have had the inadvertent effect of improving the Facilities does not negate Defendants' contractual obligation to perform it, so long as it was necessary to meet legal or insurance requirements or keep the Facilities fit for the Primary Intended Use.

In contrast, Defendants argue that Section 7.1 required them only to "relinquish the property in substantially the same condition as when the lease commenced." [DE 164 at 3660–61]. Because Section 7.1 created only "an obligation to 'maintain' the facilities," Defendants claim they were "not obligated to improve the facilities" under that section. [DE 164 at 3660]. Gunzburg

succinctly captured this position in his testimony at trial: "you replace a Honda part with a Honda part . . . and a Rolls-Royce with a Rolls-Royce part." [DE 160 at 3511]. Under Section 7.1(b), Defendants' maintenance and repair obligations were not so minimal.

While the Court agrees that Defendants were "not obligated to improve the facilities" *per se* under Section 7.1, Defendants were required to repair aspects of the Facilities "interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen" as needed to achieve compliance with legal and insurance requirements, as well as maintain it in high quality operating and structural condition for the Facilities' Primary Intended Use. *See Alaska Realty Co. v. Comm'r of Internal Revenue*, 141 F.2d 675, 677–78 (6th Cir. 1944) (comparing a "more extensive obligation" to "renew, repair, and replace the property . . . so as to maintain and keep it in as good order, repair, and condition as originally" with a "comparatively minor obligation" to "keep the buildings and improvements in good order and repair and replace all or any part thereof whenever necessary") (internal quotations omitted); *Tinsley v. Smith*, 115 A.D. 708, 712 (N.Y. App. Div. 1906) (distinguishing a covenant to "keep the premises in good order" from a covenant to "surrender the premises in as good condition as they were at the commencement of the term"). "Primary Intended Use," "Authorizations," "Legal Requirements," and "Insurance Requirements" provide ascertainable standards that Section 7.1(b) is to be measured by, and the Court interprets "high quality" to describe a facility that meets and maintains those standards for a skilled nursing facility with the number of beds and ancillary services required. So, to use Defendants' analogy, although "high quality" does not mean that Defendants were required to replace every Honda part with a Rolls-Royce part, the broad scope of Section 7.1(b) required them to repair and maintain every Honda part to meet those defined standards in the contract—regardless of the cost, and regardless of its condition upon commencement of the lease.

### ii.   Breach and damages for maintenance and repair obligations

Having determined the scope of Defendants' duty under Section 7.1 of the Master Lease—to "maintain" the Facilities in a manner fit for the Primary Intended Use and perform repairs as necessary to meet minimum legal and insurance requirements as a skilled nursing facility—the Court now turns to breach and damages.  As discussed above, Plaintiffs' $1.7 million assessment of damages is an improper measure of damages because this figure stems from Plaintiffs' concession in the subsequent ELC Lease to improve the Facilities.  [DE 165 at 3728].  As a result, the Court assesses Plaintiffs' specific claims for damages to determine whether Defendant breached their duty to keep and maintain the Facilities during the term of the Master Lease.

### a.   Replacement of the Clifton Oaks roof ($221,682.15)

Plaintiffs have not shown by a preponderance of the evidence that Defendants failed to meet their maintenance and repair obligations regarding the Clifton Oaks roof.  The EMG Report found the roof in good/fair condition, and estimated large replacements were not needed for approximately five years.  [PX 20 at 2, 4].  That was consistent with Chapman's assessment that the roof had a useful life of 20 years.  [PX 39].  And while Abrams testified and the PC&D Reports said that the Clifton Oaks Facility had "widespread active leaks throughout the building," Chapman's testimony that no active leaks were identified when the PC&D Report was created undercuts that evidence.  [PX 21 at 10; DE 145 at 2478].  Chapman also agreed with the statement that "in the past six months there have been eight leaks that have required professional attention" and that "[Defendants] took the action to repair the leaks."  [DE 145 at 2479].  The EMG Report and Chapman's testimony directly contradict the PC&D Reports and Abrams' testimony that there were widespread leaks throughout the roof.  After evaluating the record and assessing the witnesses' credibility at trial, the Court finds the EMG Reports and Chapman's testimony more

reliable.  As a whole, the EMG Reports offer more detail than the PC&D Reports, and EMG does not have the same business relationship with Plaintiffs as PC&D.  Instead, the EMG Reports were created as part of an arm's-length transaction.  Therefore, Plaintiffs have not shown that Defendants failed to repair the roof by a preponderance of the evidence, or that the condition of the roof violated any requirements for a high quality skilled nursing facility under Section 7.1(b).[16]  The Court finds Defendant not liable for the Clifton Oaks Facility roof repair.

**b.  Reworking of the domestic water supply at Clifton Oaks to avoid issues created by leaks that formed in the copper pipes ($121,759.58)**

Plaintiffs had repaired at least 8 leaks in the copper piping prior to the PC&D report, [PX 21 at 5], though the EMG Report found the system as a whole was in good condition and would not require replacement for at least another ten years.  [PX 20 at 2, 4].  The PC&D Report stated that one wastewater line had to be dug up and replaced, while another was draining slow and would soon need replacement.  [PX 31 at 5].  Some repairs done already had required jackhammering the floor in "occupied spaces."  [*Id.*].  The PC&D Report also found that raw sewage had recently flooded the basement due to the plumbing.  [*Id.*].  Because the pipes would leak and seep through the concrete, as Abrams testified, the PC&D Report estimated $300,000 was required for upgrades. [DE 145 at 2512–14; PX 21 at 5].

While Defendants did implement some repairs of the hot water system, the ongoing risk of a domestic water supply on its last leg threatened the functionality of the Facility for its Primary Intended Use.  The repeated disruption to residents of needing to jackhammer through the floor to identify and repair leaks interfered with the day-to-day operations required to meet requirements

---

[16] Plaintiffs point out that Defendants "do not address" the Clifton Oaks Roof or Vanceburg foundation problems in their proposed Findings of Fact and Conclusion of Law.  [DE 166 at 3770].  As such, the Court has relied on the Defendants' evidence from trial on these points.

of a nursing home.  The frequent leaks reflected in the PC&D Report reveal that the system needed

a larger overhaul than piece-by-piece repairs, and that the system as a whole was no longer fit for

the Primary Intended Use.  Plaintiffs are entitled to damages for the Clifton Oaks water supply.

### c.   Replacement of the Kirtland roof ($213,410.00)

The evidence at trial demonstrated that there was a major problem with the Kirtland roof

leaking around 2017.  [DE 165 at 3718 (citing PX 184 at 9984; PX 173; PX 186].  But while the

PC&D Report for the Kirtland Facility estimated $250,000 to replace the roof because it still had

active leaks, which comported with Abrams' testimony, [PX 29 at 12; DE 145 at 2549], that

evidence was contradicted by Chapman's testimony that despite recent rain, the PC&D Reports

identified no active leaks in the Kirtland Facility's roof.  [DE 145 at 2476–78].  It was also

contradicted by the EMG Reports which similarly found no leaks or short-term deficiencies.  [PX

28 at 584].

The relevant question is not whether the roof ever leaked during Defendants tenancy, but

whether they made repairs to return it to "good and lawful order and condition and in compliance

with all Legal Requirements, Insurance Requirements and Authorizations" when turned back over

to Defendants.  [PX 2 at 2280].  Defendants claim to have made repairs to the roof during their

tenancy, and while they may be unable to specify the date and nature of those repairs, [DE 165 at

3717 (arguing that Gunzburg could not identify the area where the roof was repaired and

Meadows' emails did not identify where the roof repair occurred)], Plaintiffs have not established

that ongoing leaks persisted at the end of Defendants' tenancy.  Here again, the Court must weigh

contradictory evidence that states opposite conclusions about whether active leaks persisted.  After

weighing the credibility of witnesses at trial and assessing the evidence, Plaintiffs have not shown

by a preponderance of the evidence that Defendants failed to meet their maintenance and repair

obligations.  Accordingly, the Court finds Defendants not liable for breach of its maintenance and repair obligations regarding the Kirtland roof.

### d.  New boiler and chiller at Hillcreek ($122,523.45)

The boiler and the chiller at Hillcreek were part of an old system that the EMG Reports acknowledged would need to be replaced soon.  [PX 26 at 369–70].  The chiller was installed in 1969, and one back-up boiler had not been functional since 2016.  [PX 27 at 2].  However, it is also true that the EMG Reports found the HVAC system was still in good/fair condition and that the Hillcreek Facility was never cited for its temperature rising above 81 degrees.  [PX 26 at 369–70; DE 146 at 2718–20].  While Abrams believed that this must have meant Defendants utilized temporary cooling units rather than replacing the system, no evidence of this is documented in the record.  [DE 146 at 2718–20].  That a system has exceeded its *expected* useful life, as Chapman stated the HVAC system had, [PX 39], does not mean it was no longer functional for the Primary Intended Use.  Because the Facilities were never cited for a problem with temperature regulation, and the EMG Report found the HVAC system in good/fair condition at the end of their lease despite suggesting it would need replacement soon, [PX 26 at 369–70], Defendants did not breach their maintenance and repair obligations for the Hillcreek boiler and chiller.

### e.  Parking lot at Stanford ($68,191.10)

Plaintiffs cannot recover for replacing the parking lot at Stanford.  The EMG Report found the parking lot would not need to be replaced for six years and rated the condition of this parking lot as good/fair.  [PX 34 at 918, 920].  Repaving a parking lot would not affect the ability of the Facilities to function for their Primary Intended Use unless the parking lot was in such egregious disrepair that vehicles could not navigate it.  While overlaying approximately 60 spaces with asphalt, as the PC&D Report recommended, [PX 35 at 9], would have improved the Stanford

Facility, it was not required by the maintenance and repair obligations because no evidence showed its condition interfered with its Primary Intended Use. As a result, Defendants did not breach their obligations under the Master Lease for the Stanford parking lot.

### f.   New roof at Vanceburg ($140,514.00)

Plaintiffs also cannot recover for the new roof at Vanceburg. The EMG Report found that the roof was in good condition, [PX 36 at 1033], and the PC&D Report also found that the roof and gutters were functional. [PX 37 at 10]. Given there were no citations reported and both reports found it was in good operating condition, Defendants did not breach their maintenance and repair obligations under the contract for the Vanceburg roof.

### g.   Investigation and remediation of settling issues at Vanceburg ($322,398.00)

The evidence suggests that the Vanceburg Facility had been developing settling issues over a long period of time; well before Defendants operated it. Abrams characterized it as a "long-standing problem getting worse by the day," [DE 145 at 2551], and the PC&D Report found that it had major settling issues developed over a long period of time. [PX 37 at 13]. It estimated a total spend of $25,000, assuming that all previous repair work had been successful, and estimated between $50,000 to $100,000 if more structural work was required. [*Id.*]. The EMG Report did note that the foundation and superstructure were in good condition, but this conflicted with the rest of the evidence. [PX 36 at 1068].

The settling was a repair that eventually would have been required to keep the Vanceburg Facility operating for its Primary Intended Use. The language of the maintenance and repair obligations of Section 7.1(b) does reach "structural" and "extraordinary" repairs. [PX 2 at 2280]. Defendants seemed to be aware of this issue, as an email from a Vanceburg administrator in 2017 indicates. [DE 165 at 3718; PX 175]. Abrams advised at the time that a "shifting building" could

cause several other problems such as fire doors not closing properly, [PX 175], and needed to be remedied.  As a result, by accepting the "as is" condition of the Facilities and agreeing to take on "structural" and "extraordinary" repairs necessary to keep the Facilities in "good and lawful order," Defendants should have repaired this significant structural damage.  While state inspectors did not issue citations for these settling issues, it is clear the problem had existed for a long time and would have threatened the Primary Intended Use if allowed to continue because it could do severe damage to the rest of the Facility.  Even though the Court has found the EMG Reports to be generally thorough and reliable, the weight of the other evidence on this issue cuts against the EMG Report conclusion that the foundation was in good condition.  As a result, Plaintiffs are entitled to the $322,398.00 for the settling issues at Vanceburg.

### h.  New cooler at Green Hill ($74,050.00)

Plaintiffs are entitled to some damages on the Green Hill cooler, but not the entire $74,050 they seek.  The EMG Report was silent on the condition of the Green Hill cooler.  [PX 24].  But the PC&D Report noted only minor issues in the kitchen area, noting that the walk-in cooler was original to the building, the cooler doors were not adequately sealing, and there was ice build-up. [PX 25 at 8].  As a remedy, the PC&D Report recommended a $3,000 total spend for the kitchen, primarily for replacing the cooler doors.  [*Id.*].  Abrams was not sure if the cooler doors themselves needed replacement or only the seal.  [DE 146 at 2654–55].  Nothing in the PC&D Report or Abrams testimony establishes a need for replacing the entire cooler for the purposes of the Primary Intended Use.  As a result, Plaintiffs are entitled to the $3,000 estimated for replacing the cooler doors, but not the entire $74,050 for replacing the entire walk-in cooler.

## B.  Obligations to Pay for Property Condition Reports

Plaintiffs claim that Defendants were obligated to pay for Plaintiffs' PCR expenses.  Both parties agree that the Master Lease unambiguously imposed such an obligation, [DE 164 at 3666; DE 166 at 3776], but Defendants argue that they were not required to pay because Plaintiffs never provided an invoice for the PCRs.  [DE 164 at 3667].  Plaintiffs respond that this argument amounts to a condition precedent, and that no such condition precedent is expressed in the four corners of the contract.  [DE 166 at 3776].

Plaintiffs bear the burden of proving the elements of breach of contract by a preponderance of the evidence.  *Zimmerman v. Crothall*, 62 A.3d 676, 691 (Del. Ch. 2018).  Because the Master Lease unambiguously establishes Defendants' duty to pay for Plaintiffs' PCR expenses, the outcome turns merely on whether Plaintiffs met their burden of proving the expenses incurred for the PCRs.  While it is true that no invoices were ever sent to Defendant, as Andrews conceded, nor were any invoices introduced at trial,  [DE 153 at 2908], Andrews's testimony regarding the cost of each PCR was consistent with the emails that she sent Defendants requesting payment, and there is no dispute that EMG created the PCRs.  [DE 166 at 3776].  Plaintiffs assert that this is sufficient to prove damages, and so the Court need not be certain of the amount.[17]  [DE 166 at 3776].  The Court agrees that this is sufficient to show that Plaintiffs incurred expenses for the creation of the EMG Reports.

---

[17] Plaintiffs cite *Siga Techs., Inc.*, 132 A.3d at 1131 for the proposition that "less certainty is required of the proof establishing the *amount* of damages" once "the injured party has proven the *fact* of damages."  [DE 166 at 3776].  While that case was discussing expectation damages from lost profits, a similar principle applies here because the Court finds that Andrews's testimony and emails do establish the fact that damages occurred by a preponderance of the evidence.

At the time, however, the Court finds it was reasonable that Defendants would withhold payment without proof of the expenses via an invoice.[18]  Indeed, Amar testified that Defendants had a practice of not paying for expenses without first receiving an invoice, and that doing so without one would violate GAAP principles.[19]   [DE 156 at 3373–74].   Even Andrews acknowledged that skilled nursing facilities would usually rely on an invoice before paying.  [DE 153 at 2908–09].  But Plaintiffs have shown enough at trial to establish that the expense actually occurred.  In emails, Finn explained that Plaintiffs planned on ordering PCRs, [PX 115 at 5992], and Andrews noted that the cost would not exceed $5,000 per facility.  [DX D33 at 2073].  Even though Plaintiffs did not sent Defendants a copy of the PCRs, Defendants likely knew they were created (or at least being researched) because Cochran accompanied EMG employees when touring the facilities.  [DE 153 at 3136, 3161, 3192–93, 3241].  Andrews also notified Gunzburg that he owed $22,500 for the EMG reports, [PX 133 at 6235], which matched her testimony that the EMG reports costed $2,500 per facility.  [DE 153 at 2779].

Because Plaintiffs demonstrated the fact that they incurred PCR expenses at trial, they are entitled to recover those costs.  The plain language of the contract, as both parties agree, clearly makes Defendants responsible for reimbursement.  [PX 2 at 2280].  The Court will not assess any

---

[18] Under "Additional Rent," the contract explains:

> In addition to the Base Rent, Tenant shall also pay and discharge as and when due and payable all other amounts, liabilities and obligations which Tenant assumes or agrees to pay under this Lease. In the event of any failure on the part of Tenant to pay any of those items referred to in the previous sentence, Tenant will also promptly pay and discharge every fine, penalty, interest and cost which may be added for non-payment or late payment of the same.  Collectively, the items referred to in the first two sentences of this Section 2.2 are referred to as "Additional Rent."  Except as may otherwise be set forth herein, any costs or expenses paid or incurred by Landlord on behalf of Tenant that constitute Additional Rent shall be reimbursed by Tenant to Landlord within ten (10) days after the presentation by Landlord to Tenant of *invoices* therefor.

[PX 2 at 2270 (emphasis added)].

[19] The contract incorporates GAAP in various locations.  [*See*, *e.g.*, PX 2 at 2269 ("All accounting terms not otherwise defined in this Lease have the meanings assigned to them in accordance with GAAP, as applicable."), 2277 ("Tenant shall keep and maintain, or cause to be kept and maintained, proper and accurate books and records in accordance with GAAP[.]")].

interest or fees, however, because it was reasonable for Defendants to expect an invoice for the expenses prior to paying them. Accordingly, after assessing the credibility of witnesses at trial and weighing all of the evidence presented, the Court finds that Defendants are liable for reimbursing the cost of Plaintiffs' PCR reports in the amount of $22,500 without any interest or fees.

### C. Capital Expenditures

Defendants concede that they never made Capital Expenditure Deposits, as required by the Master Lease. [DE 153 at 2791–92]. Without accounting for labor, Defendants had a Capital Expenditure Deficit of $195,217.28 across four Facilities, [DE 153 at 2796; DE 156 at 3328], and the parties agree to the following principal amount of Capital Expenditure Deficit for each facility: Green Hill ($52,700.52), Hillcreek ($30,631.88), Lyndon Woods ($49,257.71), Kirtland ($62,627.16). [DE 164-1; DE 165-4]. Plaintiffs contend that they are owed this principal in full. In contrast, Defendants argue that labor costs should have been considered Capital Expenditures and subtracted from the principal, bringing the total amount owed for Capital Expenditure Deficits down to $43,782.82. [DE 164 at 3670, 3687]. Because the Master Lease does not specify who determines whether an expenditure is considered a Capital Expenditure, [DE 153 at 2874], the Court must determine whether it was appropriate for Plaintiffs to exclude Defendants' labor costs.

The contract defines "Capital Expenditures" as "repairs, replacements, and improvements" that "constitute capital expenditures in accordance with GAAP." [PX 2 at 2313]. At trial, both Amar and Andrews gave testimony regarding the classification of labor as a Capital Expenditure. Amar was certified in GAAP principles, but Andrews was not. [DE 156 at 3315–16; DE 153 at 2873]. According to Amar, both software and labor associated with leased equipment under a multi-year lease are typically characterized as a capital expenditure under GAAP. [DE 156 at

3321].  In contrast, Andrews explained that she did not know whether GAAP permitted labor expenses to be counted as Capital Expenditures.  [DE 153 at 2874–75].  Because Andrews was not trained in GAAP principles and could not testify as to whether labor costs should count as Capital Expenditures, Plaintiffs can point to no evidence that contradicts Amar's testimony that labor should have been included under GAAP principles.  Additionally, Amar's testimony is consistent with the Delaware Court of Chancery's understanding of GAAP principles in a previous case.  *See Chambers v. Genesee & Wyoming Inc.*, No. CIV.A. 354, 2005 WL 2000765, at *9 n. 38 (Del. Ch. Aug. 11, 2005) ("[I]t appears that . . . U.S. GAAP requires that associated labor costs be capitalized.").  Therefore, after weighing the evidence and assessing Amar's and Andrews' credibility and qualifications, the Court finds labor costs should have been considered Capital Expenditures.  Because labor costs should have been considered Capital Expenditures, the Court finds those costs must be subtracted from the principal.  As a result, Defendants total deficit owed to Plaintiffs for Capital Expenditures is $43,782.82.

### D.  Kirtland Facility Bed De-licensure

Defendants counterclaim that Plaintiffs are liable for unreasonably denying Defendants' request to de-license 60 beds.  [DE 164 at 3672–86].  Plaintiffs argue in response that their decision to deny the request constituted a commercially reasonable business judgment, under the Master Lease.  [DE 166 at 3781–87].  Section 18.4 of the Master Lease provided Defendants with a pathway to "submit a written notice to Landlord requesting that Landlord approve the transfer, surrender or de-licensure of a portion of the Excess Beds no longer necessary[.]"  [PX 2 at 2280].  Defendants used this provision to request de-licensure of 60 beds because the Kirtland Facility had a significant number unfilled; census had dropped to 113 out of 180 beds prior to the commencement of the Master Lease.  [PX 69].  Yet Plaintiffs' approval of such a request is

conditioned by Section 18.4 as follows: "Provided that the proposed transfer, surrender or de-licensure of such Excess Beds will not, as determined by Landlord in its *commercially reasonable judgment*, negatively impact the value of the Ohio Property in any material respect, Landlord's consent to such action shall not be *unreasonably* withheld, conditioned or delayed." [PX 2 at 2280 (emphasis added)]. The operative words—"commercially reasonable" and "unreasonably withheld"—are dispositive of this claim. The Court finds that Plaintiffs' judgment in denying Defendants' request was commercially reasonable, and so approval of the request was not "unreasonably withheld."

Gunzburg's testimony was Defendants' only evidence at trial that Plaintiffs' denial of their request was not commercially reasonable. Gunzburg suggested that the Kirtland Facility may have been more valuable with fewer beds, [DE 160 at 3420], explaining that, using a cap rate of 13%, reducing the bed licenses by 60 would have increased the value of the facility by $2.15 million. [DE 160 at 3421]. But this testimony was unsupported by any independent evidence or expert testimony. Alternatively, Plaintiffs identified several reasons for the denial of Defendants' request at trial. Both Finn and Watts explained that nursing homes often trade and price on a per bed basis, meaning that unfilled beds can contribute to a higher value. [DE 143 at 2159, 2228, 2296]. Thus, it was commercially reasonable to want to retain these beds, especially considering that the beds would be "gone forever" once de-licensed. [*Id.* at 2190].

Moreover, Plaintiffs reasonably had concerns about Defendants ability to maintain the Facilities and continue as tenants. [*Id.* at 2138, 2157]. Plaintiffs explain that Defendants would raise "a litany of excuses and delays" when asked to remit funds to Plaintiffs, [*Id.* at 2135–37], Plaintiffs consistently had to badger Defendants to pay rent and real estate taxes, [*Id.* at 2137; DE 145 at 2343], and Defendants were in default with their working capital lender, MidCap. [DE 143

at 2138–40, 2147, 2197]. Significantly, Defendants default with MidCap also placed Defendants in default under the Master Lease. [DE 143 at 2133; PX 2 at 2294 (Section 13.1.4)]. Under these circumstances, it was commercially reasonable for Plaintiffs to deny Defendants' request in order to retain the value of the Facility for a future tenant. As Plaintiffs point out, ELC's ability to fill the 160 beds further confirms the reasonableness of their position on de-licensure. [DE 166 at 3783].

After sufficient opportunity to assess the credibility of witness testimony on this issue and weigh the applicable evidence, the Court finds that Plaintiffs' decision to deny bed de-licensure was commercially reasonable. Gunzburg offered little to support his assertion that de-licensure would have actually increased the Facilities' value. In contrast, the Court finds Finn's and Watts' perspective more compelling. Even if Gunzburg were correct that de-licensing beds could increase value in some specific circumstances, the Court finds Plaintiffs' testimony that even unfilled beds can contribute to higher value to be a reasonable basis for denying Defendants' de-licensure request. It was reasonable to want to preserve more bed space for a future tenant, especially when Defendants were in default with MidCap and struggling to make rent payments consistently. Plaintiffs provided ample evidence at trial to demonstrate as much, and Gunzburg's unsupported testimony is insufficient to overcome it. Accordingly, the Court finds Plaintiffs are not liable to Defendants for denying the Kirtland de-licensure request.

### E.  The Guaranty

Plaintiffs assert that the plain language of the Guaranty unambiguously renders Gunzburg liable for Redwood's default, and that the Guaranty was unconditional. [DE 166 at 3778]. Defendants argue in response that Gunzburg is not liable under the Guaranty because Plaintiffs failed to meet a condition precedent to provide 10 days' written notice to Gunzburg stating

Defendants were in default.  [DE 164 at 3672].  Plaintiffs counter that, even if the Guaranty contained a condition precedent, Defendants have waived that argument by not timely raising it with particularity in their answer.  [DE 166 at 3777].  The Court agrees that Defendants were required to raise their condition precedent argument in their answer and that even if it had been properly raised, the plain language of the Guaranty renders Gunzburg liable.

To argue that Plaintiff failed to meet a condition precedent under the Master Lease, Defendants were required to plead it "with particularity" in their answer, under Fed. R. Civ. P. 9(c).  *See Gottlieb & Gottlieb, P.A. v. Crants*, 657 F. App'x 920, 922 (11th Cir. 2016).  In their answer, Defendants assert only that "Plaintiffs failed to satisfy all obligations and/or conditions precedent under the contracts, if any."  [DE 16 at 91].  A general pleading is sufficient to claim that a condition precedent was satisfied but is *insufficient* to claim that a condition precedent was *not* satisfied.  Fed. R. Civ. P. 9(c); *see Kirkbride as Tr. of R & K Tr. v. Antero Res. Corp.*, No. 2:22-CV-2251, 2022 WL 4329336 (S.D. Ohio Sept. 19, 2022).  Because Defendants failed to identify the alleged condition precedent of 10 days' notice with any particularity in their answer, they cannot now assert it as a defense to liability under the Guaranty. *See Pike Co., Inc. v. Universal Concrete Prods., Inc.*, 616 F. Supp. 3d 253, 260–61 (W.D.N.Y. 2022).

Even if this were not the case, Defendants' argument fails under the plain language of the Guaranty.  To prove breach of the Guaranty, Delaware law requires Plaintiffs to prove "(1) absolute and unconditional guaranty; (2) the underlying debt; and (3) the guarantor's failure to perform under the guaranty."  *Fanatics Retail Group (Dreams), LLC v. Truax*, 2020 WL 7042873, at *3 (D. Del. Dec. 1, 2020).  The language of the contract clearly expresses that the Guaranty was entered into "absolutely, unconditionally, and irrevocably," [PX 14 at 2251 (Section 2(a))], and an

abundance of language in the Guaranty and Master Lease confirms the intention of the parties that Gunzburg was an unconditional guarantor.[20]

Defendants cannot overcome the volume and clarity of the Guaranty's language expressing Gunzburg's unconditional obligation. Read together with this language, the 10 days' notice provision Defendants point to under Section 2(a) of the Guaranty is not a condition precedent. Section 2(a) begins by establishing that Gunzburg "absolutely, unconditionally, and irrevocably guarantees, as a primary obligor and not merely as a surety" all monetary obligations under the Master Lease and performance of all "covenants, terms, conditions, obligations, indemnities and agreements." [PX 13 at 1]. The parties' intent to bind Gunzburg as an unconditional guarantor is obvious, and so the 10 days' notice cannot be interpreted as anything more than a method of procuring payment from Gunzburg in the event of Defendants' default. To construe that language as a condition precedent would not faithfully reflect the "parties' intentions as reflected in the four corners of the agreement" and would nullify the bulk of the plain language in the Guaranty. *Athenian Venture Partners I*, 36 A.3d at 779. Thus, the Court finds Gunzburg liable under the Guaranty.

---

[20] Plaintiffs direct the Court to the following language:

> Gunzburg also expressly waived "(iii) notice of any and all defaults by [Redwood] under the [Master]" and "(iv) all other notices, demands and protests, and all other formalities of every kind in connection with the enforcement of the Obligations, omission of or delay in which, but for the provisions of this Section 4, might constitute grounds for relieving [Gunzburg] of [his] obligations" under the Guaranty. [PX 14 at 2254 (§ 4(a))]. Finally, Gunzburg waived any defenses arising from "(xi) any neglect, delay, omission, failure or refusal of [Golden Living] to take or prosecute any action for the collection or enforcement of any of the Obligations . . . it being the intention hereof that [Gunzburg] shall remain liable as a principal on the Obligations notwithstanding any act, omission or event that might, but for the provisions hereof, otherwise operate as a legal or equitable discharge of [Gunzburg]." [PX 14 at 2255 (§ 4(c))].

[DE 166 at 3778].

## IV.     CONCLUSION

Having thus considered the parties' filings and the applicable law, and being otherwise sufficiently advised, the Court **ORDERS** as follows:

1.  Plaintiffs are entitled to recover from Defendants for breach of the Master Lease's maintenance and repair obligations in the amount of: $121,759.58 for the Clifton Oaks water supply; $322,398.00 for the Vanceburg settling issues; and $3,000 for the Green Hill cooler.

2.  Plaintiffs are entitled to reimbursement for the PCR reports in the amount of: $22,500.00.

3.  Plaintiffs are entitled to recover the total remaining principal owed by Defendants for failure to spend the required capital expenditures, but with no interest or late fees: $43,782.82.

4.  Gunzburg is liable for the full amount of damages owed by Defendants to Plaintiffs under the Guaranty.

January 24, 2024

Rebecca Grady Jennings, District Judge
United States District Court

cc:     counsel of record